| | |
|---|---|
| BRIAN WEAVIL,<br><br>*Plaintiff,*<br><br>v.<br><br>ANNA JOYNER, BARRY SURRATT, and STEPHANIE VEST, in their individual and official capacities; BOBBY F. KIMBROUGH, JR., in his official capacity as Forsyth County Sheriff; and TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, as surety for the Forsyth County Sheriff,<br><br>*Defendants.* | **COMPLAINT**<br><br>JURY TRIAL DEMANDED |

## INTRODUCTION

1. Plaintiff Brian Weavil was a veteran teacher, enrolled in a prestigious program to become a principal. But his life was upended—and his career ruined—when Defendants instigated patently false criminal charges against him.

2. As explained below, the charges were based on bizarre, conflicting allegations of sexual assault by a mentally ill student, H.S.

3. H.S. had a well-known history of making fabricated allegations against others. Defendants knew this—they previously investigated claims made by H.S. and found them to be unsupported. Teachers and administrators knew it, too.

4. One day, Mr. Weavil warned H.S. about "crying wolf." His comment infuriated H.S. She told other students that she would "make him regret saying that."

5. The students told Mr. Weavil what H.S. had said. So he took extensive measures to avoid ever being alone with her. He enlisted the help of many other teachers and students in this regard.

6. Months later, H.S. made good on her promise and came up with a horrible tale. She said that Mr. Weavil had sexually assaulted her twice—each time *at school*, with *others present*. The second time, she claimed, he digitally penetrated her vagina *in the classroom* in an attempt to "make her moan." By H.S.'s own account, there were other students in the room, but they were "looking at their phones" and didn't notice.

7. H.S. also said that Mr. Weavil had paid her to take lewd photos of herself— again, always at school—using his phone. She said she did this at least ten times.

8. The claims were completely and utterly false.

9. As Defendants investigated, no one corroborated H.S.'s stories. Nor did Defendants find a shred of physical evidence to support the claims—no pictures, no notes, no money.

10. Meanwhile, Mr. Weavil ardently proclaimed his innocence. He voluntarily surrendered his phone and computer to be searched; he was interviewed for hours without a lawyer present; and he demanded to take a polygraph test. He also provided Defendants with a list of more than a dozen witnesses—including teachers and students who were *in the room* at the time he allegedly assaulted H.S.—that would quickly exonerate him. Defendants chose not to interview any of those potential eye-witnesses.

2

11.     Then, before Defendants charged Mr. Weavil, H.S. made a virtually identical claim of sexual assault (by digital penetration of her vagina) against another adult in her life—her aunt's fiancé, "Uncle Mike".

12.     The same day H.S. accused Uncle Mike, the school principal told Defendant SRO Barry Surrat, on video, that H.S. was "Bat. Shit. Crazy." and that she "didn't believe" her. SRO Surrat agreed that H.S. was "off the chain," but said it was "way above his paygrade" to do anything about it.

13.     H.S. was hospitalized for psychiatric care shortly thereafter.

14.     The claim against Uncle Mike deeply concerned H.S.'s parents. *Months before Mr. Weavil was charged*, the parents told Defendants, in writing, that their daughter did not understand "the impact of falsely accusing a person" and asked that someone interview her again. No one did.

15.     Instead, Defendants discouraged H.S. from pursuing this new claim because it was not credible and would "hurt" their case against Mr. Weavil.

16.     Defendants charged Mr. Weavil with six sex crimes, ending his career in education and ruining his reputation. Four and a half years later, all of the charges were dismissed for "insufficient evidence."

17.     Defendants omitted material facts when seeking felony warrants against Mr. Weavil—including that H.S. had a history of making false claims of sexual assault; that H.S. had recently accused her Uncle Mike of similar conduct; that H.S. had been hospitalized for psychiatric care; and that no physical evidence supported her allegations.

3

18. Then, a year after Mr. Weavil was charged, two students told a teacher that H.S. had boasted that she had "framed" Mr. Weavil for sexual assault. The teacher immediately made this information known to Defendants, *but they never acted on it*.

19. An investigative report prepared by Defendant Surrat mentions the teacher who brought this information forward, but says nothing about H.S.'s confession that she framed Mr. Weavil. The report was buried in an unrelated case file, under a different case number.

20. But for Defendants' deliberate withholding of information, no charges would have been filed. Instead, charges hung over Mr. Weavil and his family for nearly *five years*.

21. No reasonable investigator would have believed there was probable cause to charge Mr. Weavil. H.S. made wholly uncorroborated claims of gross sexual misconduct, during school, *in the presence of others*—claims she repeated almost verbatim against another adult male in her life around the exact same time.

22. And no reasonable investigator would have hidden exculpatory evidence of H.S.'s confession from the prosecution. Doing so was patently unlawful.

23. Tragically for Mr. Weavil, Defendants' failures and omissions ended his career and devastated him personally. He files this action to seek redress.

## JURISDICTION AND VENUE

24. This Court has original jurisdiction over Mr. Weavil's federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3).

4

25. This Court also has supplemental jurisdiction over Mr. Weavil's state-law claims pursuant to 28 U.S.C. § 1367. All claims brought in this complaint derive from the same nucleus of operative facts and are part of the same controversy.

26. Under 28 U.S.C. § 1391(b), venue is proper in the United States District Court for the Middle District of North Carolina because (1) all of the events giving rise to this action occurred in the District and (2) all parties reside in this District.

## PARTIES

27. Plaintiff Brian Weavil ("Mr. Weavil") is a citizen and resident of Forsyth County, North Carolina. Mr. Weavil and his wife, Melissa, have been married for more than twenty (20) years. They have two children, a boy and a girl. As detailed below, Mr. Weavil previously taught science for seventeen (17) years in the Winston-Salem/Forsyth County School System ("WS/FCS"). Today, he works as a forestry biologist.

28. Defendant Anna Joyner ("Investigator Joyner") is a sergeant with the Forsyth County Sheriff's Office ("FCSO"). At the times of the events described herein, Investigator Joyner was an investigator in FCSO's Special Victims division. In that position, Investigator Joyner was authorized to investigate and prosecute crimes involving child sexual abuse. On information and belief, Investigator Joyner is a citizen and resident of Forsyth County, North Carolina. Investigator Joyner is sued in her individual capacity under 42 U.S.C. § 1983; in her individual capacity under state law for actions that were malicious, corrupt, and in excess of the scope of her lawful authority; and in her official capacity under state law to the extent of the Sheriff's waiver of immunity.

5

29. Defendant Barry Surratt ("SRO Surratt") was an FCSO deputy. SRO Surratt retired from FCSO in April 2022. At the time of the events described herein, SRO Surratt served as a school resource officer at Walkertown High School. On information and belief, SRO Surratt is a citizen and resident of Forsyth County, North Carolina. SRO Surratt is sued in his individual capacity under 42 U.S.C. § 1983; in his individual capacity under state law for actions that were malicious, corrupt, and in excess of the scope of his lawful authority; and in his official capacity under state law to the extent of the Sheriff's waiver of immunity.

30. Defendant Stephanie Vest ("Sergeant Vest") is a sergeant with the FCSO. At the times of the events described herein, Sergeant Vest was a supervisor in FCSO's Special Victim's division. On information and belief, Sergeant Vest is a citizen and resident of Forsyth County, North Carolina. Sergeant Vest is sued in her individual capacity under 42 U.S.C. § 1983; in her individual capacity under state law for actions that were malicious, corrupt, and in excess of the scope of her lawful authority; and in her official capacity under state law to the extent of the Sheriff's waiver of immunity.

31. Defendant Bobby Kimbrough, Jr. ("Sheriff Kimbrough") is the elected Sheriff of Forsyth County. Sheriff Kimbrough is sued here in his official capacity only. He has obtained insurance and a surety bond that will indemnify him on the claims against his office.

32. Defendant Travelers Casualty and Surety Company of America ("Travelers") is the entity from which the Forsyth County Sheriff purchased a surety bond pursuant to N.C. Gen. Stat. §§ 58-76-5 and 162-8 that waives immunity to the extent of the bond.

**Mr. Weavil was an exceptional teacher, training to become a principal.**

33. Before he was wrongly arrested and prosecuted for child sexual assault, Mr. Weavil gave seventeen (17) years of his life to our public schools. He was highly respected, had an exceptional resume, and was enrolled in a prestigious principal-training program.

34. From 2001 to 2014, Mr. Weavil taught Earth/Environmental Science at East Forsyth High School in Kernersville, North Carolina. In 2012, he was recognized as "Teacher of the Year" at East Forsyth.

35. In 2014, he took a position teaching Earth/Environmental Science and AP Environmental Science at Walkertown High School in Walkertown, North Carolina. In 2016, he was recognized as "Teacher of the Year" at Walkertown.

36. During his time at Walkertown, Mr. Weavil served the school community in many ways. He was on the Student Discipline Committee, the School Improvement Team, the Teacher Advisory Council, and the Student Advisory Council. He was head of the Science Department. He worked as a New Teacher Mentor. And he was selected to represent Walkertown at WS/FCS's Core Value Summit two years in a row.

37. After nearly two decades as a teacher, Mr. Weavil took steps to become a principal—his "dream job." In 2017, he applied for, was recommended for, and was accepted into the prestigious, expenses-paid North Carolina Principal Fellows Program ("Fellows Program") through UNC Greensboro ("UNCG")—his ticket to becoming a school administrator. Just twenty-five (25) teachers were selected for the Fellows Program that year after a rigorous, state-wide selection process.

7

38.     The Fellows Program awarded Mr. Weavil a $63,000 scholarship and stipend to pursue a master's degree in Education Administration.  In return, Fellows are required to work for at least three years as a principal (or an assistant principal) in North Carolina public schools after completing the program.

39.     During the first year of the Fellows Program (Fall of 2018 through Spring of 2019), Mr. Weavil was allowed to work twenty (20) hours a week in addition to taking graduate-level classes at UNCG.  Mr. Weavil used that time to work as a substitute teacher at Walkertown High School.

**Defendants knew H.S. was a troubled student known to lie for attention.**

40.     In the Spring of 2018 (the semester before he began the Fellows Program), H.S. was a student in Mr. Weavil's Earth/Environmental Science class at Walkertown High School.

41.     In that same year and earlier, school administrators and SROs (including SRO Surratt) investigated a series of unfounded sexual-abuse claims made by H.S. to gain attention.  For example:

- H.S. accused a student, J.H., of grabbing her breast in the school auditorium. An SRO investigated this claim and documented it in a formal report.  No witnesses corroborated H.S.'s story, and no juvenile charges were ever filed.

- H.S. accused another student, A.B., of putting his hand up her skirt during class.  SRO Surratt was notified of these allegations and instructed teachers, including Mr. Weavil, to keep H.S. and A.B. "separated."  Despite accusing him of assault, H.S. continued to try and sit next to A.B. in class and teachers had to keep them separated.

- H.S. accused a former boyfriend, B.P., of "smacking her butt" and kissing her without consent at school.  An SRO investigated and determined that the acts were consensual.  No discipline was imposed on B.P.

8

- Most dramatically, H.S. later accused B.P. of raping her *in a classroom*. H.S. later admitted to at least two others—including Mr. Weavil's teacher assistant, Gloria Herman—that she had lied about being raped by B.P. Defendants Surrat, Joyner, and Vest learned about this false claim and H.S.'s admission that she made it up at the outset of their investigation into Mr. Weavil.

42. One day in Mr. Weavil's class in Spring 2018, H.S. talked openly about being sexually assaulted by these students and others. Mr. Weavil overheard H.S. and told her that sexual assault was a very serious matter, and that if she kept "crying wolf," she would make it harder for actual victims to be believed.

43. This admonition upset H.S. and she asked to leave the room.

44. At the end of class, two students, S.G. and M.B., told Mr. Weavil that H.S. had told them that she would "make him regret saying that to her."

**Mr. Weavil took precautions to avoid H.S.**

45. After this incident, H.S. began "coming around" with greater and greater frequency. H.S. told several friends that she "like[d] Mr. Weavil" because she didn't have a "father figure" in her life, and she often sought his attention.

46. Mr. Weavil took precautions to protect himself.

47. To avoid ever being alone with H.S., he began eating lunch in other teachers' classrooms and fleeing to the Student Services office.

48. He asked his fellow faculty members to stand next to him in the hallway between classes and generally "stay close" when H.S. was around.

49. And he made sure that, whenever possible, his interactions with H.S. were in plain view and in front of the school's security cameras.

9

50.     At the time he was first made aware of the allegations against him, Mr. Weavil provided Investigator Joyner with the names of nine (9) Walkertown teachers and staff who could confirm the actions he took out of concern about H.S.

**Defendant SRO Surratt and others investigated rumors of "pictures."**

51.     A year later, in March 2019, Walkertown's principal, Misty Walker ("Principal Walker"), heard a rumor that an unnamed student and an unnamed teacher had exchanged lewd pictures via "text message or social media."

52.     At this time, Mr. Weavil was in the Fellows Program and substituting part-time for a teacher out on maternity leave.  He did not have H.S. as a student in his class.

53.     Principal Walker asked SRO Surratt to help her investigate the rumor.

54.     On March 29, 2019, Principal Walker and SRO Surratt interviewed five students about the rumor.  All of the interviews were recorded by SRO Surratt's bodycam.

55.     None of the students had seen any such pictures, but they relayed the following information:

- Several students had heard that H.S. was "the girl sending pictures."

- Some students had heard there was just one teacher involved; others heard there were two teachers involved.

- Two students said that a teacher named "Mr. Barnes" was involved.

- None of the five students identified Mr. Weavil as being involved.

**H.S. accused Mr. Weavil of paying her for "pictures" and assaulting her at school.**

56.     Based on this information, Principal Walker and SRO Surratt interviewed H.S. in the presence of her mother Theresa, and her partner, Leslie.  The interview was likewise recorded on SRO Surratt's body cam.

57. H.S. initially denied that she had ever sent lewd pictures to any teacher, and expressed frustration about the rumors.

58. In response, SRO Surratt urged H.S. to be truthful. He explained that it was a "felony" to send explicit pictures to a teacher, and that, if law-enforcement learned "later on" that H.S. had done so, it would be "far more incriminating."

59. H.S. then began to cry and said the following:

- Near the end of the 2018 school year, Mr. Weavil gave her a copy of a survey.

- The survey was about "people who," like H.S., "had grown up without a father figure in their household, and how it would affect them in the long run."

- The survey included questions like: "Would you ever pay for sex?" and "Would you ever do anything for money?"

- The following day, Mr. Weavil gave H.S. a different copy of the same survey—one that included his own, personal answers—"so that she could read it." Mr. Weavil told H.S., "I just want you to know, some of my deepest secrets are in there."

60. H.S. could never produce this "survey".

61. Despite having first denied the rumors about "pictures," H.S then went on to say that:

- Some time after giving her the survey, Mr. Weavil began to "ask her for pictures" in exchange for money.

- To get the pictures, Mr. Weavil would first give H.S. money—usually $20— and then give her his phone. H.S. would take Mr. Weavil's phone to a school bathroom, take a lewd picture of herself, then return the phone to him.

- She claimed that she was paid and took pictures for Mr. Weavil about ten (10) times at school over the course of several months. All of their interactions were at school, during normal hours.

11

62. H.S. also said that Mr. Weavil assaulted her twice on the last day of the 2018 school year (June 11, 2018). In her telling:

- H.S. and a few other students were helping Mr. Weavil clean up his second-floor classroom that day.

- Mr. Weavil asked H.S. to carry some materials to a storage closet attached to another teacher's classroom on the third floor. While they were in the storage closet Mr. Weavil came up behind her, "reached down" and "started feeling [her]" for a few seconds.

- Later, back in Mr. Weavil's classroom, Mr. Weavil put his fingers in H.S.'s vagina. He did this while other students were *in the classroom*, and only stopped when another student came over to the table where he was sitting.

- Months later, at the start of the next school year, Mr. Weavil showed H.S. a text message he had typed out on his phone. The message said that if she "ever told anyone what happened, he would cut her body up into a hundred pieces and spread them across five different states."

63. Shortly after her interview at the school, H.S. went for a follow-up interview at FCSO's offices.

64. Investigator Joyner—who would become the lead investigator on the case—conducted the interview. H.S. reiterated to Investigator Joyner that Mr. Weavil had assaulted her twice on June 11, 2018—first in the storage closet, then later in his classroom.

65. In discussing the alleged assaults, H.S. stated that there were other students in Mr. Weavil's classroom that day. She said that the second assault continued until a student walked "right next to the table" where Mr. Weavil was sitting. When asked if any of the other students saw Mr. Weavil touch her, H.S. said they "didn't notice" because they were "looking at their phones." H.S. went on to say that—despite there being others in the classroom—Mr. Weavil told her during the second assault that he was "trying to get her to moan."

66. With respect to the alleged "pictures," H.S. stated that Mr. Weavil would "send her notes in class" detailing what he wanted to see and how much money he would pay her.

67. She had no such notes, and no investigator asked H.S. how Mr. Weavil could have passed her notes without other students seeing.

68. H.S. also spoke inconsistently about when Mr. Weavil allegedly "gave her money" for the "pictures":

- H.S. first told Investigator Joyner that Mr. Weavil gave her $40 at the end of her freshman year (June 2018).

- She then said he never gave her money until her sophomore year (Fall 2018).

- She then backtracked and said he gave her $40 "after he touched [her]" in June 2018 in the storage closet.

- She later changed her telling a third time, saying that Mr. Weavil gave her $40 "*before*" they went into the storage closet.

69. Investigator Joyner failed to document or consider these and other glaring inconsistencies in H.S.'s story.

70. Near the end of her interview, H.S. told Investigator Joyner that two other students—a former boyfriend, N.B., and a close friend, K.S.—knew "all the details and the severity of the situation" with Mr. Weavil and could corroborate "everything." But as detailed below, when FCSO investigators interviewed N.B. and K.S., neither corroborated H.S.'s allegations.

71. Even with H.S.'s evolving account, reasonable investigators would have expected to find evidence of the alleged crimes—for example, the "pictures" she claimed to take on ten separate occasions; the notes she claimed to exchange with Mr. Weavil in class;

13

the surveys she claimed Mr. Weavil showed her; video footage from Walkertown surveillance cameras showing an exchange of money or pictures in the hallway; or students who witnessed or even heard of the alleged assaults. No corroborating evidence was ever found.

**Mr. Weavil showed Defendants that he had nothing to hide.**

72. On April 1, 2019, Mr. Weavil arrived at Walkertown to work as a substitute teacher. SRO Surrat, Investigator Joyner, and Principal Walker quickly confronted him. Their interactions were recorded by SRO Surratt's bodycam.

73. Investigator Joyner told Mr. Weavil that he had been accused of soliciting "nude pictures" from a student. She did not tell him who had made the accusations, or anything else about them.

74. Mr. Weavil vehemently denied soliciting any photos. He pleaded with Principal Walker: "What in the world am I supposed to do? I trust you more than anyone around here. What am I supposed to do? . . . Look at me, please. What am I supposed to do?"

75. Mr. Weavil voluntarily surrendered his computer and phone to be searched without a warrant. Mr. Weavil also gave Investigator Joyner all of his email addresses and passwords.

76. A forensic search of the devices and accounts did not yield and photos or other incriminating evidence.

77. That same day, Mr. Weavil voluntarily went to FCSO's offices to be interviewed by Investigator Joyner. He was completely cooperative, and answered all questions without an attorney present.

14

78. During his FCSO interview, Investigator Joyner falsely told Mr. Weavil that he was accused of having inappropriate relationships "more than one" student. She falsely claimed that there were *two* "victims / accusers," but that she had only "spoke[n] to one so far."

79. Investigator Joyner asked Mr. Weavil if any students had "come onto" him, or "had a crush" on him. Without knowing who had accused him, Mr. Weavil explained that H.S. had followed him around at the end of the last school year and "would not leave him alone."

80. Mr. Weavil explained that he took every precaution he could to "protect himself" from H.S.'s conduct—that he tried to always avoid H.S. and asked "teacher after teacher," as well as other students, to be with him when she came around.

81. Mr. Weavil recalled that H.S. once took his phone without his permission and that other teachers could confirm that he was frantically looking for his phone that day.

82. Mr. Weavil also said that, at the end the 2017-2018 school year, H.S. shocked him during class by showing him a picture of her "crotch." Mr. Weavil pretended to ignore the picture, and never acknowledged it to H.S. But he later told another faculty member, Coach Reeves, what H.S. had done.

83. Finally, Mr. Weavil said that, on the last day of her freshman year, H.S. tried to sit on his hand several times—both while he was sitting at his desk in his classroom, and while they and other students were putting materials in a storage closet on the third floor.

15

84. To corroborate these events, Mr. Weavil telephoned his former teacher's assistant, Gloria Herman ("Gloria") from the FCSO interview room. Mr. Weavil spoke to Gloria over speaker phone with Investigator Joyner listening.

85. Gloria recalled Mr. Weavil telling her that H.S. had tried to "put her[self] on his hand" that day, and that he "had to warn other teachers about it."

86. Gloria also told Investigator Joyner that Mr. Weavil regularly asked other teachers to intervene when H.S. was around him, and had asked that Gloria make every effort to "be around if H.S. was around."

87. At the end of the interview, Mr. Weavil gave Investigator Joyner the names of nearly a dozen witnesses who could vouch for what he was saying.

88. On April 9, 2019, Mr. Weavil sent Investigator Joyner the same list of names via email. The list included teachers that "openly knew how [H.S.] was toward [him]" and whom Mr. Weavil asked to "help [him] protect himself" from H.S. The list also included students and teachers who were present on June 11, 2018, when Mr. Weavil allegedly assaulted H.S, including:

- Mr. Brooks—a teacher working on the third floor that day. Mr. Weavil called Mr. Brooks and expressly asked him to "send some students downstairs" to his classroom so that he would not have to be alone with H.S. **Defendants never contacted Mr. Brooks.**

- E.G. and A.H.—the two students Mr. Brooks sent to Mr. Weavil's classroom. E.G. and A.H. were in Mr. Weavil's classroom at the time he allegedly penetrated H.S. with his fingers. **Defendants never contacted E.G. or A.H.**

- Ms. White and Ms. Hall—two teachers who were with Mr. Weavil, H.S., and others in the third-floor storage room at the time of the first alleged assault. **Defendants never contacted Ms. Hall, and Ms. White corroborated that Mr. Weavil pleaded with others to help him deal with H.S.**

16

89. Throughout the interview, Mr. Weavil pleaded that he had done nothing wrong with or toward H.S. and begged Investigator Joyner to confront H.S. about her pattern of dishonest behavior.

90. No one at FCSO ever interviewed H.S. about Mr. Weavil again.

**H.S. accused a family member of sexual assault and called herself "insane."**

91. Less than a month into the investigation, H.S. made a series of statements that destroyed what little remaining credibility she had.

92. On April 25, 2019, H.S. left class to speak with SRO Surratt in his office. She expressed anger at her ex-boyfriend, N.B., for refusing to corroborate her story about Mr. Weavil. H.S. told SRO Surratt that N.B. was "just covering for her" and being untruthful with investigators.

93. In response, SRO Surratt revealed a complete unwillingness to scrutinize H.S.'s claims, saying "There may be a lot of things that you haven't told me; I don't care. When it's a 14-year-old and a grown man it's not your fault—period."

94. H.S. then described how she had frequent mental breakdowns, engaged in self-harm (cutting), and had extremely vivid, sometimes violent thoughts. Specifically, H.S. recounted a dream she had where she was "on trial for prostitution." She told SRO Surratt that, in this dream, she "pulled out a gun in the courtroom," shot everyone present, then "smiled and laughed about it."

95. H.S. shared that, "one day when she was really mad about nothing," she thought through the process of "how to do a Holocaust." She concluded by saying, "I think I should be in a straightjacket, because I'm that insane."

17

96. The next day, April 26, 2019, H.S. again left class to speak with SRO Surratt. During that conversation, H.S. shared another extremely vivid "daydream." In that "daydream," H.S. chopped up her parents' bodies while they were asleep, threw her dog out the window, then burned her house down. H.S. also talked about how she idolized The Joker (the Batman character) because he "killed over 2000 people."

97. Given these statements, SRO Surratt told H.S. that he thought she "needed help." He called a guidance counselor and Principal Walker into his office to talk to H.S.

98. He also phoned H.S.'s mother, Theresa, to tell her about the "daydream."

99. H.S. told SRO Surratt, the guidance counselor, Principal Walker, and Theresa that she had thought about overdosing.

100. Later that same day, SRO Surratt convened a meeting with H.S.; Theresa and her domestic partner, Leslie; Principal Walker; a guidance counselor; and a school psychologist. The meeting was recorded by SRO Surratt's bodycam.

101. During the meeting, H.S. made another outlandish, but strikingly similar, allegation of sexual assault by another adult male in her life—the fiancé of Leslie's sister, whom she referred to as "Uncle Mike".

102. H.S. had spent Labor Day weekend 2018 with "Aunt Dotty and Uncle Mike" at their home in nearby Stokes County. She claimed that, while watching television, Uncle Mike "unbuckled her pants and *did the same thing that Weavil did*."

103. As they listened to H.S. make this identical claim of digital sexual assault, Leslie and Theresa were in visible disbelief. Despite this claim, H.S. had often asked her parents to spend more time with Uncle Mike.

18

104. Leslie asked H.S. the obvious question: Why would she want to continue spending time with Uncle Mike if he had assaulted her? "You were very adamant about staying with Dotty and Mike [again]," she said. H.S. did not answer the question.

105. H.S. then recounted to everyone present the "daydream" she had had about killing her family.

106. Leslie responded that the supposed daydream sounded "exactly like" the plot of a movie that H.S. and her friends had recently watched.

107. That same day, SRO Surratt's bodycam captured a conversation he had in the Walkertown staff suite with Principal Walker about H.S.:

- SRO Surratt whispered to Principal Walker that, "[H.S.] is off the chain, man."

- Principal Walker—apparently not realizing she was being recorded—replied, "That girl is Bat. Shit. Crazy. Do you understand when I say I didn't believe some of the other stuff?"

- Principal Walker added, "You're telling me she didn't have the ability to reach for the [remote control] and watch a Lifetime movie and string something together?"

- In response, SRO Surratt chuckled and said, "Yeah, it's way above my pay grade."

108. H.S. was admitted to Brenner Children's Hospital in Winston-Salem for in-patient psychiatric treatment from April 26 to May 2, 2019.

109. SRO Surratt summarized the events of April 26, 2019 in a letter to Investigator Joyner dated May 8, 2019. On information and belief, neither this letter nor the fact of H.S.'s hospitalization for psychiatric care were disclosed to prosecutors, the charging magistrate, or the Grand Jury before Mr. Weavil was charged and indicted.

**Defendants deliberately downplayed the "Uncle Mike" allegations.**

19

110. On May 9, 2019—two months before Mr. Weavil was charged and arrested—Theresa and Leslie met with Sergeant Vest to convey their "concerns" about H.S.'s allegations.

111. Among Theresa and Leslie's stated concerns—memorialized in a document they provided at the meeting—were:

- The "impact of falsely accusing a person of [molestation]"; and

- The "importance that [H.S.] understands the consequences of [her] accusation."

112. Sergeant Vest admitted to Theresa and Leslie that H.S.'s identical claim of digital penetration by Uncle Mike "doesn't make [H.S.'s] case with Weavil stronger . . . because it's going to be looked at like lightning, and does it strike twice."

113. Indeed, Sergeant Vest suggested that H.S. wait to report Uncle Mike to authorities in Stokes County until the case against Mr. Weavil had concluded, because doing so could "hurt" the Weavil case.

114. Theresa told Sergeant Vest that she had often warned H.S. about lying too much, because people would think she was "crying wolf."

115. Theresa and Leslie were so concerned about H.S.'s dishonesty that they asked Sergeant Vest to reinterview her and determine whether she was being truthful.

116. Sergeant Vest told Theresa and Leslie that FCSO would reinterview H.S. and "dot the i's" with her. But there is no record that ever happened.

117. Instead, on July 17, 2019, the FCSO charged Mr. Weavil with six felony sex offenses. He turned himself in that same day.

20

118. On information and belief, Investigator Joyner did not disclose to the magistrate that H.S. had made identical allegations against "Uncle Mike"—and before that, demonstrably false assault claims against male students—when she obtained warrants for Mr. Weavil's arrest.

119. The next day, July 18, 2019, Investigator Joyner finally reached out to the Stokes County Sheriff's Office about the "Uncle Mike" case.

120. On information and belief, Investigator Joyner did not disclose to the magistrate that H.S. had made similar allegations against Uncle Mike—or, for that matter, against other students—when she sought an arrest warrant for Mr. Weavil.

121. Detective Anna Keaton oversaw the Stokes County Sheriff's Office's investigation into Uncle Mike. As part of her investigation, Detective Keaton attempted to interview H.S. However, H.S. refused to assist with the case against Uncle Mike, telling Detective Keaton that she "just wanted to put things behind her."

122. No charges were ever filed against Uncle Mike.

**Defendants' "investigation" was reckless and glaringly incomplete.**

123. Defendants charged Mr. Weavil without *any* physical evidence to support H.S.'s baseless statements.

124. They found no relevant photos, communications, or documents in her possession or in Mr. Weavil's.

125. H.S. alleged that she took pictures of herself on Mr. Weavil's phone "ten times" in exchange for money. But the consent searches of *all* of his electronic devices and

21

accounts did not yield any photos of H.S. (or any other student); any communications with H.S. (or any other student); nor the "surveys" that H.S. said Mr. Weavil showed to her.

126. FCSO did not find any relevant video evidence from Walkertown High School. The school has security cameras in all of the hallways. H.S. stated that Mr. Weavil gave her his phone and money in the hallways, but no footage showed any such interactions.

127. FCSO did not find any of the paper "notes" Mr. Weavil allegedly passed to H.S. during class and in the hall.

128. Nor did FCSO's interviews of H.S.'s supposed witnesses support her claims:

- H.S. told Investigator Joyner that her ex-boyfriend, N.B., knew "all the details" about the "situation" with Mr. Weavil. Investigators interviewed N.B. *three times*—on March 28 (SRO Surratt), April 24, and May 16, 2019 (Investigator Joyner). N.B. consistently told them that H.S. would never share lewd photos with anyone, that the "rumors" about her were simply untrue, and that he knew nothing about her interactions with Mr. Weavil.

- H.S. likewise told Investigator Joyner that her "best friend," K.S., knew "all the details" about her and Mr. Weavil. Investigator Joyner interviewed K.S.— like N.B., he said that the "rumors" about H.S. sharing lewd pictures were untrue, and that he never saw Mr. Weavil touch H.S. or give her money. Although K.S. recalled H.S. mentioning that Mr. Weavil once "threatened her," he said it was on the last day of her freshman year (not the first day of her sophomore year, as H.S. told investigators).

- A different FCSO officer, Investigator K. L. Granger, interviewed two Walkertown teachers—Julie White and Kayla Combs—that taught near Mr. Weavil.

  - Both teachers said that Mr. Weavil told them H.S. made him extremely uncomfortable.

  - Both teachers recalled that Mr. Weavil actively tried to avoid H.S.— for example, by "camping out" in their classrooms between periods—so as to never be alone with her.

  - Neither teacher ever saw Mr. Weavil act inappropriately toward H.S. or any other student.

22

- Investigator Granger also interviewed Walkertown student C.B. on June 10, 2019.

  - C.B. said that Mr. Weavil and H.S. spoke often.

  - C.B. also said that, on one occasion, Mr. Weavil let H.S. borrow his phone because she did not have hers and wanted to check her social media.

  - C.B. also said that she was present when H.S. and Mr. Weavil were putting supplies in the storage closet during the last week of the 2017-2018 year and never saw anything "happen between them."

129. The investigation into Mr. Weavil was gravely deficient in other ways, too.

130. First, Defendants never interviewed other persons present during the alleged assaults.

131. Mr. Weavil gave Investigator Joyner the names of two witnesses—E.G. and A.H.—who were present at the time H.S. said he assaulted her in the classroom. There is no record that investigators interviewed either of them.

132. Mr. Weavil so feared being alone with H.S. on the last day of school that he called another teacher, Mr. Brooks, and asked him to send E.G. and A.H. downstairs to his classroom. E.G. and A.H. were in Mr. Weavil's classroom throughout the time he allegedly assaulted H.S. there.

133. H.S. told Investigator Joyner that Mr. Weavil continued to digitally penetrate her until another student (presumably E.G. or A.H.) walked "right up next to" the desk where Mr. Weavil was sitting.

134. Mr. Weavil also told Investigator Joyner that he could provide the names of seven total students who were in his classroom on the day of the alleged assaults; she never followed up.

23

135. Second, Mr. Weavil asked Investigator Joyner to interview another faculty member—Coach Reeves—about H.S. showing him a photo of herself near the time of the alleged assaults.

136. Investigator Joyner did not interview Coach Reeves until December 2019, months after she charged Mr. Weavil. In that interview, Coach Reeves confirmed that Mr. Weavil had told him that H.S. tried to show him a picture of herself on her phone.

137. Third, Mr. Weavil demanded at the outset of the investigation that he be allowed to take a polygraph test. Investigators ignored this offer.

138. Finally, investigators did not reinterview H.S. after new developments greatly diminished her credibility—she made a nearly identical claim against Uncle Mike; she shared bizarre stories of violent thoughts and was hospitalized as a result; and her parents said they feared she did not understand the "impact of falsely accusing a person."

**Mr. Weavil was charged and indicted.**

139. As noted, on July 17, 2019, the FCSO charged Mr. Weavil with six sex offenses. He turned himself in for arrest that same day.

140. Investigator Joyner obtained the arrest warrants from Magistrate D. Hines. On information and belief, Investigator Joyner did not disclose to Magistrate Hines that the sole witness in the case, H.S.:

- Had a lengthy history of making false allegations of sexual assault;

- Recently accused Uncle Mike of a nearly identical sexual assault by digital penetration, but continued to spend time with him;

- And was admitted for in-patient psychiatric care between the time she made the accusations against Mr. Weavil and the time investigators applied for the warrants.

24

141. Investigator Joyner further omitted the following material information when seeking a warrant from Magistrate Hines:

- That H.S.'s parents doubted her credibility and expressed concern that her allegations were false;

- That investigators had searched Mr. Weavil's electronic devices and found no evidence of any photos or correspondence between H.S. and Mr. Weavil, or the survey he allegedly showed her;

- That none of the alleged photos taken by H.S. for Mr. Weavil were ever found;

- That the only two witnesses that H.S. claimed would corroborate her story had failed to so.

142. To Mr. Weavil's utter devastation, the false charges of sexual predation were widely covered in the media. To this day, articles featuring his mugshot are readily found on the internet. *E.g.*, *Forsyth County teacher accused of sex crimes that involved a young female student, deputies say*, WXII12.com (July 17, 2019), available at https://bit.ly/4i69XaT.



25

143. Mr. Weavil was processed through the Forsyth County Detention Center.

144. Mr. Weavil had to furnish a secured bond of $400,000.

145. On November 18, 2019, a grand jury that was not informed of the evidence that impeached H.S. and exonerated Mr. Weavil, indicted Mr. Weavil on six felony counts based on the alleged June 11, 2018 assaults:

- Two counts of committing a statutory sexual offense with a child (G.S. 14-27.30(A));

- Two counts of committing sex acts with a student (G.S. 14-27.32(A)); and

- Two counts of taking indecent liberties with a child (G.S. 14-202.1)).

146. No charges based on the alleged "pictures" were filed, despite H.S. insisting that she exchanged lewd photos for money "ten times" over the course of several months.

147. Through the time of his arrest, indictment, and ultimate dismissal of all charges, Mr. Weavil ardently maintained his innocence.

### Defendants buried newly discovered, exonerating evidence.

148. In March of 2020, less than a year after Mr. Weavil's arrest, Walkertown teacher Nina Street ("Ms. Street") received unsettling information.

149. Two students—S.A. and R.L.—approached Ms. Street and asked if she knew about H.S.'s accusations against Mr. Weavil. S.A. and R.L. told Ms. Street that, at the end of their freshman year, H.S. told them that she planned to frame Mr. Weavil for sexual assault.

150. S.A. and R.L. said that H.S. was upset with Mr. Weavil. H.S. then said she would "get him back"—first by making it seem like he molested her, and then by "turning him in."

26

151.    S.A. and R.L. emphasized to Ms. Street that the accusations against Mr. Weavil were "all a lie," that they were certain he "didn't do any of it," and that they were mortified H.S. actually went through with her plan.

152.    Ms. Street urged S.A. and R.L. to share this information with an SRO and Principal Walker because "a man's life was at stake."  Ms. Street later called the students' families and encouraged them to come forward.

153.    Immediately after speaking with the students, Ms. Street personally reported her conversation to Defendant SRO Surratt and Principal Walker.  Ms. Street told SRO Surratt and Principal Walker exactly what S.A. and R.L. said.

154.    No one from the FCSO ever followed up with Ms. Street or sought to interview her.

155.    On March 13, 2020, SRO Surratt continued to exhibit dogged confirmation bias.  He prepared an incident report that did not mention anything about what S.A. and R.L. told Ms. Street—that H.S. said she had framed Mr. Weavil, and that her allegations against him were completely made up.

156.    In his report, SRO Surratt instead distorted what he had learned to make it look like Mr. Weavil was pressuring S.A. to help him.  For example, he wrote:

- On March 12, 2020, S.A. was contacted by Mr. Weavil's private investigator, but declined to speak with him.

- In February 2019 S.A. heard H.S. say that Mr. Weavil would "cut her body in pieces and spread them across the country if she told what had happened."

- And "earlier in th[e] week a discussion of [the charges against Mr. Weavil] began in the classroom of Nina Street," and that Ms. Street urged anyone with new information to share it because "a man's life was at stake."

27

157. SRO Surratt's report did not mention that Ms. Street personally reported what she heard to an SRO and Principal Walker.

158. Nor did the report mention the need to interview R.L., or Ms. Street, or any others who may have been present for H.S.'s confession.

159. In fact, to hide this information further, SRO Surratt filed his report *under a new case number* (No. 20200226) unrelated to Mr. Weavil's case (No. 201902708).

**All charges against Mr. Weavil were dismissed for "insufficient evidence."**

160. Prosecutors only learned about H.S.'s stated intention to "frame" Mr. Weavil from his defense counsel. Mr. Weavil's counsel told prosecutors that Ms. Street had reported her conversation with S.A. and R.L. to SRO Surratt.

161. After confirming this information, prosecutors dismissed all six counts against Mr. Weavil—four-and-a-half (4.5) years after he was first charged. The prosecutor listed "INSUFFICIENT EVIDENCE" as the reason for dismissal.

**The damage to Mr. Weavil has been immense.**

162. On January 22, 2024, a judge ordered that Mr. Weavil's case be expunged.

163. But Mr. Weavil's career and reputation were destroyed.

164. Mr. Weavil cannot reasonably expect to work in education again. His dream of becoming a high-school principal is over. Although the charges against him were dismissed, Mr. Weavil will forever wear a "scarlet letter" and risks being perceived by students, parents, and colleagues as a child predator.

165. The moment FCSO opened its investigation, Mr. Weavil was suspended (without pay) from teaching at Walkertown. This suspension was entered into his

28

permanent record.  Mr. Weavil's teaching contract expired before his charges were dismissed.  The Board declined to renew his contract.

166.  Mr. Weavil was also suspended from the Principal Fellows Program—his best opportunity to become a school administrator.  Mr. Weavil was forced to repay $38,000 of his Fellows Program stipend/scholarship while he was suspended from teaching without pay.

167.  Had he completed the Principal Fellows Program, Mr. Weavil would have reasonably expected to become a high school principal within three years.  Given his many years of service, his annual salary in that role would have exceeded $100,000.  And upon retirement, he would have received a monthly allowance of more than $4,500/month.

168.  Since January 2020, Mr. Weavil has worked as an assistant to a forestry surveyor.  He makes $18/hour.  He receives no benefits and no employer-based retirement.

169.  To defend himself against the criminal charges, Mr. Weavil hired two attorneys and two private investigators.  He incurred more than $40,000 in legal and investigative fees before the charges against him were dismissed.  Mr. Weavil also paid $24,000 to a bail bondsman to make his $400,000 secured bond.

170.  When he lost his job and scholarship, Mr. Weavil was forced to sell his family home.  He and his family moved in with his mother, where they still live today.

171.  The fall from "Teacher of the Year" and "Principal Fellow" to accused child-sex offender put Mr. Weavil under immense psychological strain.

172.  After the allegations against him became public, Mr. Weavil and his family received regular harassing phone calls—including death threats.  One anonymous caller said

29

that he had hired someone to rape Mr. Weavil's daughter, "so he could see how it feels as a parent." Others said that they were "watching him" and accurately described his home and vehicle.

173. Mr. Weavil contemplated suicide.

174. The overwhelming majority of Mr. Weavil's friends and professional colleagues abandoned him.

175. Mr. Weavil sought therapy to treat depression and anxiety. He has seen a therapist on a monthly basis since the FCSO's investigation began.

176. In late 2019—at the height of this ordeal—Mr. Weavil's young daughter had brain surgery to treat a seizure disorder. The family had planned to stay at the Ronald McDonald House while she was hospitalized, but, due to the pending charges, were not allowed to do so. Instead, Mr. Weavil drove daily from Kernersville to Duke Hospital in Durham and, later, from Kernersville to Levine Children's Hospital in Charlotte, to spend time with his wife and recovering child.

177. For nearly five years, Mr. Weavil was unable to attend his son's middle- and high-school events, award ceremonies, and other milestones.

178. Mr. Weavil and his wife had planned to adopt a third child, but could not do so with his criminal charges pending.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### Malicious Prosecution – Fourth Amendment, 42 U.S.C. § 1983

179. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

30

180. Mr. Weavil brings this claim against Defendants Joyner, Surratt, and Vest in their individual capacities (together, the "Officer Defendants").

181. At all times relevant to this action, Mr. Weavil had the right under the Fourth Amendment not to be seized and prosecuted without probable cause. *See Thompson v. Clark*, 596 U.S. 36, 43-44 (2022).

182. The Officer Defendants procured warrants for Mr. Weavil's arrest by intentionally or recklessly providing false and misleading information to Magistrate Hines and by failing to disclose material exculpatory facts.

183. When the warrants for Mr. Weavil's arrest were issued, the Officer Defendants knew or should have known that H.S.'s allegations of sexual abuse were not reasonably trustworthy or reliable.

184. Under the complete facts and circumstances known to the Officer Defendants at the time, no reasonable person could have concluded that Mr. Weavil had committed the sexual offenses alleged in his arrest warrants.

185. Accordingly, Mr. Weavil was arrested without probable cause.

186. The Officer Defendants also "misle[d] prosecutors about the viability of charges by withholding exculpatory information until after [Mr. Weavil] was indicted." *Harris v. Town of Southern Pines*, 110 F.4th 633, 644 (4th Cir. 2024).

187. For example, just months after his arrest and indictment, the Officer Defendants learned that H.S. had told at least two students that she intended to "frame" Mr. Weavil for sexual assault.

31

188. The Officer Defendants did not convey this material, exculpatory information to prosecutors. Instead, prosecutors only learned about H.S.'s confession from Mr. Weavil's defense counsel. When they did, they dismissed all charges due to "insufficient evidence."

189. On January 17, 2024, the criminal proceedings against Mr. Weavil terminated in his favor.

190. The Officer Defendants are liable to Mr. Weavil under 42 U.S.C. § 1983 for violating his Fourth Amendment rights.

**SECOND CLAIM**
**Fabrication of Evidence – Fourteenth Amendment, 42 U.S.C. § 1983**

191. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

192. Mr. Weavil brings this claim against Defendants Joyner, Surratt, and Vest in their individual capacities (together, again, the "Officer Defendants").

193. At all times relevant to this action, Mr. Weavil had the right under the Fourteenth Amendment not to be deprived of his liberty on the basis of fabricated or omitted material evidence. *Harris v. Town of Southern Pines*, 110 F.4th 633, 645-46 & n.6 (4th Cir. 2024).

194. "In a due process fabrication of evidence claim, the alleged harm is that the entire panoply of rights afforded to criminal defendants was infected by the fabricated evidence." *Id.* at 646 (cleaned up).

195. The Officer Defendants knew that H.S. was not a reliable witness. Yet they failed to tell either Magistrate Hines or prosecutors that she had made numerous

32

unsupported allegations of sexual assault—including contemporaneous accusations against her Uncle Mike, which were quickly retracted.

196. The Officer Defendants also learned that H.S. had told other students of her intent to "frame" Mr. Weavil, but withheld this information from prosecutors. The only investigative report that even arguably touches on this revelation was filed under a different case number. The report contains no mention of the fact that a teacher, Ms. Street, directly reported this new information to an SRO.

197. As a result of the Officer Defendants' fabrications and omissions, Mr. Weavil was arrested, indicted, ordered to furnish a $400,000 bond, and made to live with outstanding child-sex-offender charges for more than four years.

198. The Officer Defendants are liable to Mr. Weavil under 42 U.S.C. § 1983 for violating his Fourteenth Amendment rights.

### THIRD CLAIM
### Malicious Prosecution under North Carolina Law

199. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

200. Mr. Weavil brings this claim against Defendants Joyner, Surratt, and Vest in their individual and official capacities (together, again, the "Officer Defendants").

201. The Officer Defendants initiated, led, and otherwise participated in Mr. Weavil's investigation, which catalyzed criminal proceedings against him without probable cause.

33

202.    Even assuming probable cause existed at the time Mr. Weavil was arrested, it dissipated when a teacher, Ms. Street, directly reported to an SRO that H.S. had told other students of her plan to "frame" Mr. Weavil.

203.    The Officer Defendants failed to disclose this newly discovered, exonerating evidence.  As a result, Mr. Weavil's prosecution continued unnecessarily for years.  *See Turner v. Thomas*, 269 N.C. 419, 431-43 (2016) (Ervin, J., concurring); *Allison v. Food Lion, Inc.*, 84 N.C. App. 251, 252-55 (1987).

204.    On January 17, 2024, the criminal proceedings against Mr. Weavil terminated in his favor when prosecutors voluntarily dismissed all charges against him.

205.    The Officer Defendants are sued in their individual capacities for acting with malice, corruptly, with reckless disregard for Mr. Weavil's rights, and beyond the scope of their lawful authority.

206.    The Officer Defendants are sued in their official capacities to the extent the Sheriff has waived governmental immunity.

### FOURTH CLAIM
### Negligence

207.    The allegations set forth in the preceding paragraphs are incorporated herein by reference.

208.    Mr. Weavil brings this claim against Defendants Joyner, Surratt, and Vest in their individual capacities (together, again, the "Officer Defendants").

209.    At all relevant times, the Officer Defendants had the following duties to Mr. Weavil:

34

- To ensure that Mr. Weavil was not wrongfully arrested and charged with crimes he did not commit;

- To rely only on credible witnesses when pursuing criminal charges;

- To exercise reasonable care when conducting criminal investigations; and

- To disclose exculpatory information, including that related to witness credibility, even if discovered after the initiation of criminal proceedings.

210. The Officer Defendants breached the above duties owed to Mr. Weavil in at least the following ways:

- By causing Mr. Weavil to be wrongfully arrested and charged with heinous crimes he did not commit.

- By relying on statements from a central witness—H.S.—that could not reasonably be seen as truthful or credible.

- By failing to interview student and teacher witnesses that were physically present at the time of the alleged sexual assaults, despite these witnesses having been identified by Mr. Weavil.

- By failing to reinterview H.S. after her own parents expressed doubts about her truthfulness.

- By failing to alert prosecutors of H.S.'s extensive history of sexual-assault allegations.

- By failing to properly document and relay to prosecutors that H.S. told at least two students that she intended to "frame" Mr. Weavil.

- In other respects, to be proven through discovery and at trial.

211. As a direct and proximate result of the Officer Defendants' negligence, Mr. Weavil was wrongfully arrested and prosecuted, and suffered physical, psychological, emotional, and pecuniary damages.

35

212. The Officer Defendants are sued in their individual capacities for acting with malice, corruptly, with reckless disregard for Mr. Weavil's rights, and beyond the scope of their lawful authority.

213. The Officer Defendants are sued in their official capacities to the extent the Sheriff has waived governmental immunity.

**FIFTH CLAIM**
**Action on Sheriff's Bond**

214. The allegations set forth in the preceding paragraphs are incorporated herein by reference.

215. Mr. Weavil brings this claim against Defendant Sheriff Kimbrough in his official capacity, and against Defendant Travelers as surety.

216. At the time of the events alleged herein, Sheriff Kimbrough had furnished a bond as required by N.C. Gen. Stat. § 162-8. Sheriff Kimbrough purchased that bond from Travelers.

217. Pursuant to N.C. Gen. Stat. § 58-76-5, Sheriff Kimbrough and Travelers are jointly liable for injuries cause by the neglect, misconduct, or misbehavior of FCSO officers.

218. FCSO officers Defendants Joyner, Surratt, and Vest injured Mr. Weavil as detailed above.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Mr. Weavil prays that the Court enter judgment in his favor and order relief as follows:

A. Compensatory damages;

B. Punitive damages;

36

C.      Pre-judgment and post-judgment interest and recovery of costs, as well as reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988 and any other applicable laws;

D.      Any other and further relief the Court deems just and proper.

## JURY DEMAND

Mr. Weavil respectfully demands a trial by jury of all issues in this matter so triable pursuant to Federal Rule of Civil Procedure 38(b).

Respectfully submitted this the 30th day of July 2025.

**TIN FULTON WALKER & OWEN PLLC**

/s/ Zachary Ezor
Zachary Ezor (NC Bar No. 55070)
119 Orange Street, Floor 2
Durham, NC 27701
Telephone: (919) 307-8400
zezor@tinfulton.com

*Counsel for Plaintiff Brian Weavil*